**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **TRONA LOGAN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | ) **Case No. 07-CV-02-TCK-SAJ** |
| | ) |
| **SABRE, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

<u>**OPINION AND ORDER**</u>

Before the Court is Defendant Sabre, Inc.'s ("Sabre") Motion for Summary Judgment (Doc. 26).  For the reasons explained below, this motion is granted in its entirety.

**I.      Factual Background**

Plaintiff Trona Logan, an African-American female, was hired by Sabre in March 1998 as a Technical Analyst in Sabre's Air Pricing Operations ("APO") department in Tulsa, Oklahoma. Technical Analysts are responsible for analyzing, coding, and inputting data regarding airline fares and rules into Sabre's electronic travel distribution database.  Such data is periodically transmitted to Sabre by commercial airlines and data vendors such as Airline Tariff Publishing Company ("ATPCo").  Plaintiff worked on the ATPCo team within the APO department.  As a member of the ATPCo team, Plaintiff's supervisor during the relevant time frame was Jim Wear ("Wear"), the Manager of Air Pricing Operations.  Wear's supervisor, and Plaintiff's manager, was Carol Moran ("Moran"), the Vice President of Air Pricing Operations.

1

A.    2002 Lawsuit

On March 26, 2002, Plaintiff and six of her African-American co-workers filed a lawsuit against Sabre in the District Court for the Northern District of Oklahoma alleging race discrimination ("2002 Lawsuit").  *See Trona Gaston, et. al. v. Sabre, Inc.*, 02-CV-225 TRB-SAJ (N.D. Okla.).  The 2002 Lawsuit was settled and dismissed in January 2003. Pursuant to the settlement, Plaintiff released all existing claims against Sabre. Following the 2002 Lawsuit, Plaintiff remained employed at Sabre.

B.    Reduction in Force

Sometime prior to July 2004, Sabre decided to outsource to India some of the processing work being completed by the APO department.  As a result, there was a need to reduce the employment levels in Sabre's APO department in Tulsa, and Sabre began the process of completing a reduction in force ("RIF").  Moran described the RIF process as follows:  "It was determined how many people we would need once India started to do some of the work.  From there, the managers developed the criteria, and then the employees were all – all impacted employees were ranked against that criteria and put in that order." (Moran Dep., Def.'s Mot. for Summ. J., Ex. D at 22:6-10.)  Sabre decided that a certain number of members of the Tulsa APTCo team would have to be laid off.  Therefore, all forty-six members of the APTCo team were ranked.[1]  The scores and rankings are set forth at Sabre's Exhibit C, which is an untitled document that contains each APTCo employee's scores in various categories and also states whether each employee would be retained or not retained

---

[1]  It appears that other teams within the APO department were also ranked for purposes of the RIF; however, the parties agree that only the APTCo team is relevant to the analysis.

2

("RIF Chart").

The ranking process of the APTCo team consisted of (1) an objective component, comprised of hard data generated from a computer program used to evaluate the "productivity" and "accuracy" of APO employees, and (2) a subjective component, comprised of scores given to employees by their supervisors in twelve specific categories. The computer program used to generate the objective component of the RIF Chart is referred to in the record as metrics or the metrics system ("Metrics"). Metrics was developed by Balaji Subramanian ("Subramanian"), an in-house industrial engineer at Sabre, for the purpose of evaluating APO employees. Metrics had been used to evaluate the work performance of APO employees since July 2003, several months prior to the RIF rankings. The scores for "productivity" and "accuracy" in the RIF Chart are based on employees' monthly Metrics evaluations since the time Sabre began using Metrics.

The subjective component of the RIF Chart consists of scores given to each employee by that employee's supervisor for the following twelve criteria: (1) customer focus; (2) innovation; (3) job knowledge; (4) adaptability; (5) initiative; (6) accountability; (7) teamwork; (8) flexibility; (9) dependability; (10) analytical skills; (11) communication; and (12) leadership skills. According to Moran, these categories represented "the criteria that we felt would be needed in the future as the department changed. So these were skills that employees in the department would need as the department evolved and this work was no longer performed." (Moran Dep. 20:3-7.)

After receiving the scores from various managers in the above twelve categories, Subramanian compiled the RIF Chart. The RIF Chart consists of nineteen total columns, the first three of which are Metrics scores, the next twelve of which are the subjective scores in

3

the twelve categories listed above, and the final four of which are conclusions based on the previous fifteen columns. The first two Metrics categories are "productivity" and "accuracy," for which employees received scores of either -7, -3, 0, 3, or 7.  The third Metrics category is "overall performance," for which employees received either -10, 0, or 10.[2]  For the next twelve "subjective" categories, it appears, although the record is not conclusive, that managers ranked these employees on a scale of 1-7, with seven being the highest score.  As to the final four conclusory columns, the first provides a "total;" the second provides an indication of whether the employee will be retained or not retained, the third provides a "current ranking," and the fourth provides a "previous ranking."[3]

The "total" scores for the APTCo team range from 86 to 17.  However, the numbers in the previous columns do not add up to the totals shown, and it is unclear from the RIF Chart how the total scores were derived.  Neither Moran nor Wear, the only Sabre employees who have offered testimony, can explain how the total scores were derived.  The "current rankings" range from 1-52, although only 46 total APTCo employees were ranked. This is because the "current rankings" skip numbers 3, 31, 41, 42, 47, and 50.  Neither Moran nor Wear could explain why certain numbers were skipped in the rankings process.

The RIF Chart contains a bold line representing the cut-off for retained and non-retained employees.  After receiving the RIF Chart from Subramanian, Moran made the

---

[2]  Only ten APTCo received "overall performance" scores.  These ten employees did not receive scores for "productivity" or "accuracy."  Moran could not explain this. Moran did note that the employees who received overall performance scores were "team leads."  (Moran Dep. 22:17-20.)

[3]  It is unclear what "previous ranking" the chart is referencing or if it played any role in the "current ranking."

4

decision of who to retain from the APTCo team, and her decision was based on the RIF Chart. Moran did not stray from the RIF Chart in making her termination decisions. Everyone above the line was retained, and everyone below the line was informed they would be laid off pursuant to the RIF, unless Sabre could find an alternative position for them within the company.

C.   Plaintiff's Lay-Off

Plaintiff received a "total" score of 39, which resulted in a "current ranking" of 42 out of 46 APTCo employees.[4]  This placed Plaintiff well below the retention cut-off line on the RIF Chart.  On July 16, 2004, Plaintiff received a letter from Greg Webb, Senior Vice President of Product Marketing, informing her that "we anticipate your position with the company will be eliminated in approximately five months" and that "[w]e will provide you official notification 60 days or more in advance of your actual separation date."  (7/16/04 Letter, Def.'s Mot. for Summ. J., Ex. F.)  The letter stated that Sabre would provide Plaintiff with "career transition services, which include a combination of on-line and on-site (or in person) tools, consulting and coaching" and that Plaintiff would "be able to apply for other jobs that open up within the company."  (*Id.*)  On October 29, 2004, Sabre notified Plaintiff that her employment would terminate on December 31, 2004.  On December 22, 2004, Plaintiff applied for two positions within Sabre, both located in New York.  Ultimately, Sabre did not fill either of these positions.  On December 30, 2004 Plaintiff worked her last day at Sabre.

D.   Plaintiff's Claims

---

[4]  Her "current ranking" listed on the RIF Chart is actually 46, but this is because numbers were skipped.

Construing Plaintiff's Amended Complaint and response brief in their most favorable light, Plaintiff asserts three causes of action arising under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C § 1981.  Plaintiff alleges that (1) Sabre retaliated against Plaintiff for filing the 2002 Lawsuit by laying her off in December 2004;[5] (2) Sabre committed disparate treatment racial discrimination in conjunction with Plaintiff's lay-off in December 2004; and (3) Sabre subjected Plaintiff to a racially hostile work environment following the 2002 Lawsuit by treating her differently than white co-workers.[6]

## II.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.* (citation omitted).  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set

---

[5] In its motion, Sabre addressed whether Sabre's failure to hire Plaintiff for other positions within the company constituted retaliation.  Plaintiff did not provide the Court with any facts, argument, or evidence regarding Sabre's decisions regarding other employment positions within Sabre.  Therefore, Plaintiff has abandoned this aspect of her claim, and it will not be addressed.  In any event, Sabre's evidence shows that the two positions for which Plaintiff applied were never actually filled.

[6] Sabre characterizes Plaintiff's claims as ones for retaliation and hostile work environment.  However, Plaintiff's Second Amended Complaint alleges discrimination, retaliation, and hostile work environment.  (Second Am. Compl. ¶¶ 5-8.)  In addition, Plaintiff's response brief is organized in a manner indicating that a race-based termination is also alleged, in addition to a retaliatory termination.  Out of an abundance of caution, the Court will address all three causes of action.

forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  In the context of a case brought under federal employment laws, the trial court must "make a judgment as to whether the evidence . . . could persuade a reasonable jury that the employer had discriminated against the plaintiff." *Hooks v. Diamond Crystal Specialty Foods, Inc*., 997 F.2d 793, 798 (10th Cir. 1998).

## III.    Retaliation/Racial Discrimination

Plaintiff contends that Sabre retaliated against her for filing the 2002 Lawsuit by laying her off during the 2004 RIF.  Although Plaintiff does not have direct evidence of retaliation, retaliation claims may be proved by the burden-shifting scheme established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973).  *See Argo v. Blue Cross & Blue Shield of Okla.*, 452 F.3d 1193, 1202-03 (10th Cir. 2006).  Under this framework, Plaintiff must first establish a prima facie case of retaliation.  *Id.* at 1202.  If Plaintiff does so, the burden shifts to Sabre to "articulate a legitimate, non-discriminatory reason for" Plaintiff's lay-off.  *Id*.  If Sabre does so, the burden shifts back to Plaintiff to show that the "proffered explanation is a pretext for retaliation."  *Id.* at 1203.

Plaintiff also contends that her lay-off was based on her protected status as an African-American.  Title VII prohibits an employer from terminating any individual because of race.  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  Again, because Plaintiff does not have direct evidence that race was a determining factor in her lay-off, the burden-shifting scheme established in *McDonnell Douglas* applies to Plaintiff's claim. *See Pippin v. Burlington Resources Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006).  Under this framework, Plaintiff must first establish a prima facie case of race discrimination.  If Plaintiff does so, the burden shifts to Sabre to "rebut this presumption of

7

discriminatory intent by asserting a legitimate, non-discriminatory reason for" Plaintiff's lay-off. *Id.* at 1193.  If Sabre does so, the burden shifts back to Plaintiff "to show that [Sabre's] proffered reasons were a pretext" for race discrimination.  *Id.*

In this case, Sabre's legitimate, non-discriminatory reason and Plaintiff's evidence of pretext are the same for Plaintiff's claims for retaliation and racial discrimination.  In addition, the legal principles governing these steps of the analysis are the same for each claim. Accordingly, the Court will address whether Plaintiff has established a prima facie case for either claim and will then address pretext evidence as it relates to both claims.

A.    Retaliation - Prima Facie Case

To establish a prima facie case of retaliation, Plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." *Antonio*, 458 F.3d at 1181.  The first two elements are clearly met in this case based on Plaintiff's filing of the 2002 Lawsuit and her subsequent lay-off.  Sabre argues, however, that Plaintiff cannot establish a prima facie case because she cannot establish a causal nexus between the two events.

An employee satisfies the third element of a prima facie case "by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Id.* at 1181 (quotations omitted).  However, unless "there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *Id.* (quotations omitted).

Plaintiff first engaged in the protected opposition to discrimination on March 26,

8

2002 when she filed the 2002 Lawsuit.  All protected activities ended when the 2002 Lawsuit was settled in January 2003.  The Court therefore finds that January 2003 was the last possible date of any protected opposition to discrimination.  Moran made the decision to lay Plaintiff off in early 2004 and first informed Plaintiff of the lay-off in July 2004. Therefore, there is at least a one-year time gap between the last possible date of protected activity and the earliest possible date of an adverse employment decision by Sabre.  Such a gap is insufficient to satisfy the causation requirement.  *See id.* at 1182 (holding that a nine-month time gap is "too temporally remote to support an inference of causation); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (holding that three-month period, standing alone, is insufficient to satisfy causation element).  Plaintiff must therefore provide the Court with "other evidence" of a connection between her filing of the 2002 Lawsuit and her lay-off in order to survive summary judgment.  *See Antonio*, 458 F.3d at 1182.

Plaintiff's only "other evidence" of a causal connection is:  (1) her contention that other plaintiffs in the 2002 Lawsuit had been systematically laid off since the time of the lawsuit, and (2) her contention that Wear treated her differently than other workers "in terms of time off work, job assignments, etc."  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 11-12.) The first contention is not supported by the record.  In November 2004, Sabre promoted Amy Cisneros ("Cisneros"), an African-American employee who was a plaintiff in the 2002 Lawsuit, to the position of Senior Sales Support Representative.  Therefore, Cisneros not only survived all RIFs but received a promotion.  Even assuming the contention was supported by the record, the other plaintiffs in the 2002 Lawsuit were not "systematically" or even individually terminated.  Instead, they were victims of two previous RIFs, along with

many white employees who were not involved in the 2002 Lawsuit. This reduces any inference of retaliation against them and increases the likelihood that such employees simply did not perform well enough to survive the previous RIFs.

Plaintiff also alleges that Wear gave white employees in Plaintiff's department preferential treatment over black employees in his assignment of work schedules, customers, and work partners. However, such allegations are clearly geared toward Plaintiff's claim for race discrimination rather than her claim for retaliation. For example, in Plaintiff's statement, she describes the "differential treatment" in work assignments from management between black employees and white employees. (*See* Logan Statement, Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 1 at ¶¶ 6-11.) These allegations do not discuss her status as a former plaintiff in the 2002 Lawsuit, nor do they even imply that Plaintiff's filing of the 2002 Lawsuit motivated the alleged differential treatment. Accordingly, these allegations do not assist Plaintiff in proving a causal link between the 2002 Lawsuit and the 2004 RIF.

In sum, Plaintiff has not come forward with sufficient evidence to create a prima facie case of causation on her retaliation claim. There is at least a one-year gap between any protected activity and the adverse employment decision at issue. During this time, Plaintiff successfully maintained employment, received generally positive reviews, and survived at least two previous RIFs. There is no other record evidence that links the 2002 Lawsuit to the decision made during the 2004 RIF, and the Court finds that Plaintiff cannot establish a prima facie case as to the third element. *See Antonio*, 458 F.3d at 1182-83 (concluding that plaintiff did not create triable issue of fact because the plaintiff had received favorable reviews and the defendant had simply followed its handbook policies in deciding to terminate plaintiff).

B.      Racial Discrimination - Prima Facie Case

In the context of a RIF, the required elements of a prima facie case of intentional race discrimination are: "(1) [Plaintiff] was within the protected group, (2) [Plaintiff] was doing satisfactory work, (3) [Plaintiff] was discharged despite the adequacy of [her] work, and (4) there is some evidence that [Sabre] intended to discriminate against [Plaintiff] in reaching its RIF decision." *Juarez v. ACS Gov't Solutions Group, Inc.*, 314 F.3d 1243, 1245-46 (10th Cir. 2003).  The fourth element can be satisfied by showing that Sabre "could have retained [Plaintiff] but instead chose to keep someone of a different race." *Id.*; *see also Pippin*, 440 F.3d at 1193 (explaining that, in context of age discrimination claim, fourth element can be established through circumstantial evidence that plaintiff was treated less favorably than younger employees during the RIF).  The Tenth Circuit has made clear that the fourth element "should not be understood to require a plaintiff to produce evidence that [the protected attribute such as age, race, or gender] was a determining factor in the employer's motivation" because this would "effectively fuse the prima facie and pretext steps." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1167 (10th Cir. 1998).  Instead, in order to satisfy the fourth element, a plaintiff alleging race discrimination need only present circumstantial evidence that she was treated less favorably than members of different races during the RIF. *Id.* at 1167 n.4.  For example, a plaintiff who is fired pursuant to a RIF, and who held a similar position to a retained employee of a different race, can satisfy the fourth element. *See id.*

Plaintiff has established a prima facie case.  She is African-American and therefore within the protected group.  Although she received a low score on the RIF Chart, this does not mean Plaintiff was doing inadequate work.  She had survived two previous lay-offs and

11

had received generally positive performance evaluations.  Sabre does not appear to dispute that Plaintiff was doing at least adequate work; it simply contends that she was in the bottom tier of workers on the APTCo team.  Thus, the Court finds she was discharged despite the adequacy of her work.  As to the fourth element, Plaintiff has presented evidence that white workers on the APTCo team were retained, while the only two black employees, herself and Kathy Cheatham ("Cheatham"), were discharged.  Therefore, Plaintiff was arguably treated less favorably than white employees during the RIF.[7]

C.    Pretext - Both Claims

Sabre satisfied its burden of asserting a legitimate, non-discriminatory reason for Plaintiff's lay-off by asserting that Plaintiff was terminated due to a RIF and by showing that Plaintiff received a low ranking on the RIF Chart.  *See Pippin*, 440 F.3d at 1193 (finding that the defendant satisfied its burden by showing that there was a RIF and that the plaintiff was a substandard performer); *Beaird*, 145 F.3d at 1168 (same).  Plaintiff may nonetheless resist summary judgment if she can show that this proffered reason is unworthy of belief.  *Pippin*, 440 F.3d at 1193.  At this stage, the presumption established by the prima facie case "drops out of the picture," and the "analysis shifts to the plaintiff's ultimate burden of showing that the defendant discriminated" on the illegal basis of race or retaliation.  *Id.*

"In a RIF case, a plaintiff can demonstrate pretext in three principal ways."  *Beaird*, 145 F.3d at 1168.  First, a plaintiff can "can argue that her own termination does not accord

---

[7] Sabre does not address Plaintiff's prima facie case of race-based termination. Sabre argues that, even if Plaintiff has asserted a claim for race-based termination rather than merely one for retaliation, such claim fails based on the same "pretext" analysis that is relevant to the retaliation claim.  (*See* Def.'s Reply in Support of Mot. for Summ. J. 8 n.3.)

with the RIF criteria supposedly employed." *Id.* For example, a defendant's failure to comply with its own RIF policy may suffice to show pretext. *Id.* (citing *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586-87 (7th Cir. 1986)). However, "minor inconsistencies in the application of RIF criteria may be too insubstantial to allow a reasonable jury to infer the RIF was pretextual." *Id.* Second, "a plaintiff can adduce evidence that her evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to effect her termination." *Id.* Third, a plaintiff can adduce evidence that the RIF itself is pretextual. *Id.* "For instance, a plaintiff may establish that an employer actively sought to replace a number of RIF-terminated employees with new hires." *Id.*; *see also Pippin*, 440 F.3d at 1193 (same).

In order to demonstrate that Defendant's proffered reason is a pretext for unlawful retaliation and/or race discrimination, Plaintiff asserts that: (1) the RIF criteria were "almost all" subjective, and the subjective factors were determined by a single supervisor; (2) the objective criteria, the Metrics scores, were "subject to gaming" so as to create better results for desired employees and worse results for undesired employees; (3) Sabre has not explained how the Metrics scores and the subjective scores interplay to reach the "totals" on the RIF Chart; (4) Plaintiff's scores on the subjective criteria do not comport with her prior performance evaluations; (5) Plaintiff and Cheatham's lay-offs eliminated all "persons of color" from the APTCo team; (6) Plaintiff's lay-off eliminated the last of the original plaintiffs in the 2002 Lawsuit from the APO department, as such employees had been "systematically laid off" since the 2002 Lawsuit; and (7) Sabre has a history of racial animus in the APO department that continued after the 2002 Lawsuit. (*See* Pl's Resp. to Def.'s Mot. for Summ. J. ¶ 4(a)-(j).) Plaintiff has not explained, however, how these asserted facts tend to support any of the three methods identified above for demonstrating pretext in a RIF case.

Plaintiff does not appear to assert that her termination does not accord with the RIF criteria supposedly employed.  Nor does Plaintiff argue that Sabre replaced those employees that were laid off due to the 2004 RIF with new, non-African-American hires.  Plaintiff's evidence therefore appears to be directed to the second method of proving pretext in a RIF case, *i.e.*, that Sabre deliberately falsified or manipulated the RIF results so as to effect her termination and intentionally discriminate against her because she is black and/or because she filed the 2002 Lawsuit.

### 1.    *Subjective RIF Criteria*

As an initial matter, the Court observes that the RIF criteria were not wholly subjective.  At least some of the data on the RIF Chart was generated by Metrics and was based on "hard" performance measurements, which lessens the potential that the scores were somehow manipulated.  *Cf. Pippin*, 440 F.3d at 1195 (reasoning that evaluative process was not "wholly subjective" because it was based in part on supporting examples).  Even assuming the criteria were wholly subjective, this is not sufficient by itself to show pretext in a RIF case.  *Id.*  The "subjective nature of the evaluations may be a factor to consider in pretext but it ordinarily is not by itself sufficient to establish pretext."  *Id.* (stating the "subjective nature of the evaluations may be a factor to consider in pretext but it ordinarily is not by itself sufficient to establish pretext").  The Tenth Circuit has in fact "regularly affirmed grants of summary judgment for employers who based RIF terminations on employee rankings," even when such rankings were wholly subjective in nature.  *Id.*  The "subjective nature of the evaluations may be a factor to consider in pretext but it ordinarily is not by itself sufficient to establish pretext."  *Id.* (clarifying that Tenth Circuit's holding in *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2006), should not be read

14

to authorize finding of pretext based solely on existence of subjective criteria).  Thus, the existence of subjective criteria is merely a factor to consider and is not determinative.

      2.    *Alleged "Manipulation" of Metrics Scores and/or Unfairness of Metrics Scores*

To the extent Plaintiff contends the Metrics scores were "subject to gaming," this, standing alone, does not create an inference of pretext.  *See Beaird*, 145 F.3d at 1169 (reasoning that "the mere opportunity for manipulation" is not sufficient to show pretext because this would "require a defendant to prove non-discrimination").  Instead, Plaintiff must present further evidence that "raises the necessary inference of manipulation."  *Id.* Plaintiff has not done so in this case.  The person who input the Metrics scores and generated the Metrics scores for the RIF Chart was Subramanian.  There is no evidence whatsoever that this engineer, who did not supervise Plaintiff in any way, was motivated by racial or retaliatory animus in compiling her Metrics scores.  There is no evidence that he knew Plaintiff was African-American or that she had filed the 2002 Lawsuit.  Similarly, Moran, the ultimate decision maker, testified that she received the RIF Chart from Subramanian only after it was completed and based her decisions thereon.  There is no evidence that Plaintiff's Metrics scores were changed, altered, or skewed in any way prior to the actual RIF decisions.  *Cf. Beaird*, 145 F.3d at 1170 (finding legitimate inference of "purposeful manipulation" where "more than two months" after the company claimed to have completed the score leading to the plaintiff's termination, the company's internal documents actually revealed a higher score).

In her deposition, when asked if she had any evidence that Metrics was designed to hurt Plaintiff or other black employees, Plaintiff testified that she did not believe Metrics

15

was designed to discriminate against black employees.  Instead, Plaintiff testified that Metrics was unfair because it did not take into account the difficulty level of the work being performed.[8]  In her subsequent statement, which is Exhibit 1 to Plaintiff's response to Sabre's motion for summary judgment, Plaintiff for the first time attempted to tie this unfairness in the Metrics process to racial discrimination.  She stated that certain difficult work completed by two white employees, Joyce Singleton and Linda Levy, was not "counted" on Metrics, while difficult work she completed was "counted" on Metrics.  This resulted, according to Plaintiff, in misleading Metrics scores on her RIF Chart, which formed the basis of Moran's termination decisions.  However, these allegations also do not create an inference of pretext.  First, Plaintiff's statement is inconsistent with her deposition testimony, which was that Metrics, although unfair, was applied equally to all employees.  Second, even if believed, Plaintiff's allegations do not evidence any unlawful intent regarding the specific employment decision at issue – the 2004 RIF decisions.  The 2004 RIF decisions were made by Moran.  There is no evidence that Moran was aware of any of the alleged disparities in treatment between black and white employees regarding the Metrics scores.  There is no evidence that Moran desired, requested, encouraged, acquiesced, or even knew of any race-related differential treatment in the Metrics scores.  Even if Plaintiff's scores were somehow unfairly low, this does not help to demonstrate that Defendant's

---

[8]  Apparently, other employees also believed Metrics was an unfair measurement tool.  (*See* Statements of Joshua Foutch and Linda Mattison, Pl.'s Resp. to Def.'s Mot. for Summ. J., Exs. 4 & 5.)  However, these Sabre employees merely stated that the productivity and accuracy measurements were inaccurate and unfair.  This does not tend to prove, however, that Metrics was a means by which Sabre intentionally manipulated RIF scores in favor of white employees or employees who were not involved in the 2002 Lawsuit.

proffered reason – Plaintiff's low ranking on the RIF Chart – is "unworthy of belief" or that it is a pretext for a racially discriminatory or retaliatory reason for Plaintiff's termination.

### 3.   *Sabre's Inability to Explain RIF Chart*

The Court agrees with Plaintiff that neither the RIF Chart itself nor other record evidence explains the methodology used to reach the totals and rankings set forth in the RIF Chart.  Moran herself could not explain the totals or what they meant.  Subramanian, the Sabre employee who plugged in the Metrics scores and ultimately generated the RIF Chart, did not testify.  However, the question is not whether the RIF rankings are sufficiently explained.  The question is whether problems, inadequacies, or subjectivity in the RIF process tend to prove that RIF criteria were deliberately falsified or manipulated so as to effect Plaintiff's termination and serve as a pretext for racial discrimination and/or retaliation.  Thus, if coupled with other evidence that tended to show manipulation, Sabre's inability to explain the RIF Chart could evidence manipulation.  However, for reasons explained elsewhere in this section, the Court finds no evidence or opportunity for intentional manipulation in this case.

### 4.   *Performance Evaluations*

Plaintiff's performance evaluations, which are generally positive, are not indicative of pretext because Wear testified that he did not base his scores in each of the twelve categories on past performance.  Therefore, Wear did not necessarily give Plaintiff low scores because he viewed Plaintiff's work negatively; he merely gave her some of the lowest scores relative to other members of her department.  In addition, Moran testified that the subjective categories were designed to assess whether an employee would fit into the future direction of the department, not whether employees had performed well in the past.

17

Accordingly, Plaintiffs' past performance evaluations do not evidence pretext.

5.    *Differential Treatment in Work Assignments*

Plaintiff alleges that Wear favored white employees when making work assignments, customer assignments, and scheduling assignments, which tends to show racial or retaliatory animus in his scoring of Plaintiff for purposes of the RIF.  The Court disagrees.  First, there is no evidence that Wear made any comments tending to show retaliatory or racial animus by Wear in his treatment of Plaintiff.  Second, Plaintiff admitted that Wear did not make the decision to pair her with the person she deemed to be an undesirable partner due to racial or retaliatory animus.  Third, with respect to customer assignments, Plaintiff admitted that Wear made customer assignments based on what each employee was capable of doing, which resulted in better workers receiving more difficult assignments.  While Plaintiff found this to be unfair, there is no evidence of racial or retaliatory animus in making such assignments.  Finally, with respect to work schedules, Plaintiff contends that when she took certain time off for school, it was "counted against her" while it was not "counted against" white employees because they were given formal changes to their work schedules.  However, Plaintiff's only evidence of discriminatory intent in making these scheduling decisions is her own speculation, which is insufficient to show pretext.  *See Beard*, 145 F.3d at 1170 (a plaintiff's opinion that she was mistreated by her supervisor was not sufficient to establish pretext because it was only "speculatively attributed to discriminatory animus").  Thus, in most instances of alleged unfair treatment by Wear, Plaintiff admitted in her deposition that Wear's decisions were not in any way based on racial animus.  In other instances, Plaintiff's opinion that such decisions were based on racial animus are mere speculation.

18

6.    *History of Racial Animus*

Plaintiff settled a race discrimination claim, in which she alleged various instances of racial discrimination.  (Logan Statement ¶¶ 4-5.)  Plaintiff also offers the testimony of Carolyn Hicks ("Hicks"), who left employment with Sabre in December 2002.  (*See* Hicks Statement, Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 6.)  Hicks stated that "management was discriminatory, during that time, against the blacks based on race."  (*Id.*)  Plaintiff claims that this "history" of racial animus prior to the 2002 Lawsuit tends to prove the 2004 RIF was pretextual.

Although a history of discrimination can be relevant evidence of pretext, the Court finds any evidence of historical discrimination to be overshadowed by the utter lack of evidence of any racial animus following the 2002 Lawsuit by the relevant decision makers during the 2004 RIF.  The evidence in the record, and particularly Plaintiff's deposition testimony, evidences that racially discriminatory behavior by Sabre's management largely ceased following the 2002 Lawsuit.  This is also evidenced by Plaintiff's failure to report any racial discrimination between the 2002 Lawsuit and her lay-off in 2004.  Although Plaintiff has alleged some differential treatment by Wear in making various decisions, these allegations are not supported by the record or are based solely on Plaintiff's speculation of racial animus.  (*See supra* Part III.C.5.)  Accordingly, the Court finds that any history of racial animus occurring prior to the 2002 Lawsuit does not tend to show pretext for purposes of the 2004 RIF decisions.

7.    *Removal of All "Persons of Color"*

By "persons of color," Plaintiff likely referred to the fact that all African-Americans (Plaintiff and Cheatham) were removed from the APTCo team following the RIF, which

does not appear to be disputed.[9]   However, Plaintiff and Cheatham were also both in the bottom tier on the RIF Chart.  Removal of two black employees during a fifteen-person RIF, when the black employees scored in the bottom tier of ranked employees, does not tend to show racial discrimination.  Nor are these statistics presented in a way that eliminates non-discriminatory reasons for the alleged disparate treatment.  *See Pippin*, 440 F.3d at 1198 (finding that statistical evidence showing that fourteen of nineteen employees selected for a RIF were over forty did not evidence pretext because such evidence did "not account for any of these different individuals' circumstances, skills, or prior performances" and because the statistics did not show "whether 14/19 is an excessive percentage of over-forty terminations").  Accordingly, the mere removal of two black employees during a fifteen-person RIF does not present meaningful statistical evidence of pretext, particularly when those employees actually scored in the bottom tier.[10]

　　　　8.    *Conclusion*

　　　　Plaintiff ranked in the bottom tier of the RIF Chart.  Plaintiff has not presented evidence that tends to prove either that (1) her own termination did not accord with the RIF criteria supposedly employed; (2) her evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to effect her termination; or (3) that the RIF itself was pretextual.  Although the RIF Chart certainly could have been better explained by Sabre

---

[9]   Notably, five minority employees scored high enough to be retained in the 2004 RIF.  These individuals are also arguably "persons of color."

[10]   In addressing Plaintiff's prima facie case of retaliation, the Court rejected Plaintiff's assertion that all plaintiffs in the 2002 Lawsuit were "systematically" or intentionally removed following the 2002 Lawsuit and found that such evidence did not tend to show causation.  For the same reasons explained above, the Court finds this evidence also does not tend to show pretext.

employees, it is not this Court's role to second-guess Sabre's business decisions or chosen RIF processes. *See Beaird*, 145 F.3d at 1169 (explaining that business decisions in the RIF context need not be wise, just non-discriminatory). It is this Court's role to determine whether a reasonable jury could infer the existence of a race-based or retaliatory motive for Sabre's selection of Plaintiff for the RIF, and the Court finds that a reasonable jury could not do so based on the evidence presented. *See Pippin*, 440 F.3d at 1198 (concluding, based on totality of evidence, that the plaintiff failed to present sufficient evidence to support an inference of pretext in case in which RIF was "implemented consistently" and plaintiff presented no evidence of discriminatory intent in terminating the plaintiff).

## IV.  Racially Hostile Work Environment

To establish a racially hostile work environment, a plaintiff must show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998). For purposes of summary judgment, the question is whether a reasonable jury could conclude that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions" of her employment and "create an abusive working environment." *Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1161 (10th Cir. 2008) (quotations omitted). Pervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile work environment claim, although these two grounds are "to a certain degree inversely related." *Id.* at 1162 (quotation omitted). That is, "a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long

21

period of time also violates the statute." *Id.* (quotation and alteration omitted).

In making the determination of whether conduct is sufficiently severe or pervasive, the Court must "consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." *Id.* (quotation omitted).  The Court may also "consider the conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance."  *Id.*  The Tenth Circuit has cautioned that the inquiry is "unsuited for summary judgment because it is quintessentially a question of fact." *Id.* (quotation omitted).

Plaintiff's response brief dedicates approximately one page to the hostile work environment claim, and does not provide significant argument as to the basis of such claim. Nonetheless, the Court has endeavored to address all potential aspects of Plaintiff's hostile work environment claim.  Plaintiff appears to allege that she suffered from a hostile work environment prior to bringing the 2002 Lawsuit, including jokes and comments in the workplace as well as differential treatment.  (Logan Statement ¶¶ 4,5.)  Although not actionable due to Plaintiff's release of these claims, she argues they are relevant to show that her working environment following the 2002 lawsuit continued to be racially hostile.  As explained above, Plaintiff also alleges she suffered some disparate treatment with respect to work assignments following her settlement of the 2002 Lawsuit.  Specifically, Plaintiff argues that "there was a consistent differential treatment of Plaintiff as opposed to her white co-workers in the workplace," which created a hostile work environment.[11]

---

[11]  In Sabre's motion, it also addressed whether certain comments of co-worker Plava Plumb ("Plumb") regarding the 2002 Lawsuit contributed to a hostile work

The Court concludes that no reasonable jury could find Sabre's alleged conduct to have created a racially hostile work environment.  First, the alleged harassment was not pervasive or severe enough to alter the terms, conditions, or privilege of employment. Plaintiff herself testified that she was not subjected to any racially derogatory comments following the dismissal of her first lawsuit, and that she was not subjected to any racially motivated conduct from any of her co-workers following the dismissal of her first lawsuit. The only allegations of racial hostility relate to discriminatory treatment by Wear in making work assignments, customer assignments, and scheduling assignments.  These allegations are the same as those explained *supra* Part III.C.5.  Generally, they are that Plaintiff was forced to work with a slow partner, that she was denied the opportunity to have a part-time schedule to attend school, and that she received difficult work assignments.  However, these isolated actions by Wear, even assuming they constitute some form of racial harassment, are woefully insufficient to be considered sufficiently pervasive or severe to create a racially hostile work environment.  *See Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (affirming grant of summary judgment in favor of employer because "Plaintiff was not subjected to anything that was physically threatening or humiliating, nor was he subjected to any offensive utterances" and because his "list of grievances includes none of the racial comments or ridicule that are hallmarks of hostile work environment claims").  As with the plaintiff in *Trujillo*, the Court finds that the hostile work environment Plaintiff portrays "is simply a work environment that exhibits the

environment.  However, Plaintiff's brief did not mention or address this fact as contributing to a hostile work environment claim, and the Court finds that it is not part of her hostile work environment claim.

monitoring and job stress typical of life in the real world." *Id.* In addition, these incidents were not in any way "pervasive" or "severe." Plaintiff was at all relevant times able to complete her job duties without enduring a "steady barrage of opprobious racial comments," or enduring a race-related incident that was "so severe" as to alter the terms and conditions of her employment and create an abusive working environment. *See Witt*, 136 F.3d at 1432-33. Further, the Court finds any "historical discrimination" to be of little importance given the lack of evidence of any racial hostility during the relevant time frame.

Second, there is no evidence, other than Plaintiff's own speculation, that Wear or any other members of Sabre management were motivated by racial animus in making these decisions. As explained above, Plaintiff admitted in her deposition that Wear did not make the decision to pair her with the person she deemed to be an undesirable partner due to racial or retaliatory animus. With respect to customer assignments, Plaintiff admitted that Wear made customer assignments based on what each employee was capable of doing, which resulted in better workers receiving more difficult assignments. While Plaintiff found this to be unfair, there is no evidence of racial or retaliatory animus in making such assignments. As to work schedules, Plaintiff contends that when she took certain time off for school, it was "counted against her" while it was not "counted against" white employees because they were given formal changes to their work schedules. However, Plaintiff's only evidence of discriminatory animus is her own speculation. Accordingly, the Court finds no triable question of fact as to the second element of a hostile work environment claim. *See Trujillo*, 157 F.3d at 1214-15 (affirming grant of summary judgment in favor of employer because plaintiff presented insufficient evidence that conduct about which plaintiff complained stemmed from racial animus).

**V.      Conclusion**

As to Plaintiff's claim for retaliation, Plaintiff has failed to demonstrate a prima facie case and has failed to present sufficient evidence that the RIF decision was a pretext for retaliation.  As to Plaintiff's claim for racial discrimination, Plaintiff has failed to present sufficient evidence that the RIF decision was a pretext for racial discrimination.  As to Plaintiff's claim for a hostile work environment, Plaintiff has not identified a triable issue of fact as to (1) whether Sabre's allegedly harassing conduct was pervasive or severe, or (2) whether Sabre's allegedly harassing conduct stemmed from racial animus.  Sabre's Motion for Summary Judgment (Doc. 26) is GRANTED in its entirety.

**ORDERED this 7th day of May, 2008.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**